United States Court of Appeals
Fifth Circuit

**F I L E D**

June 20, 2007

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 06-30331

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEROME T. LEBLANC,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana

_____

Before SMITH, BARKSDALE, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

The defendant, Jerome LeBlanc, pleaded guilty to possession of a firearm by a felon, 18 U.S.C. § 922(g), and was sentenced to three years' probation. He contends that the District Court erroneously denied his motion to suppress the firearm, a .410 gauge shotgun, because it was discovered in violation of the Fourth Amendment by a

Louisiana state probation officer during an unlawful search of his home without a warrant, probable cause, or reasonable suspicion, and reserved the right to appeal this issue in his guilty plea. The Government argues, however, that the shotgun was lawfully seized by the state officer as a dangerous weapon in plain view in a home verification visit pursuant to constitutionally permissible state laws, regulations and probation conditions. The ultimate issue in this case is whether a home visit conducted by LeBlanc's probation officer violated the Fourth Amendment, which depends on: first, whether Louisiana's probation statutes and regulations are constitutional as reasonable guidelines for implementing the "special needs" of the state's system for supervising probationers for purposes of their rehabilitation and the community's protection; and, second, whether the home visit and the plain view seizure at issue here complied with these state guidelines and with the Fourth Amendment. We conclude that they did and AFFIRM.

## I. Background

In 2003, Jerome LeBlanc was convicted in a Louisiana state court of contractor misapplication of payments under Louisiana Revised Statutes 14:202, a felony, and was placed on supervised probation for five years. On July 29, 2004 a state probation officer, Todd Cruice, visited Mr. LeBlanc at his small semi-shotgun house in a rural area near Pointe A La Hac in Plaquemines Parish, Louisiana. Mr. LeBlanc does not challenge a Louisiana probation officer's authority to conduct home visits at reasonable times and intervals. Rather, he argues that Officer Cruice exceeded the bounds of his authority by inspecting his whole house without any reason to suspect him of a crime or probation violation, instead of conversing with him in his kitchen as another officer had done on a previous occasion.

Both Mr. LeBlanc and Officer Cruice testified at the motion to suppress hearing. The District Court credited Cruice's version of the episode and we see no clear error in its ruling. When Cruice informed LeBlanc that he had come for a home visit and asked if he could "look around," LeBlanc did not object but showed him the entire

3

house while pointing out each respective room and certain improvements he had made or undertaken.

As they entered the kitchen, Cruice saw a pellet gun, which he inspected to verify that it was not a firearm. LeBlanc told him that he used it to ward off snakes and varmints in his yard. In response to Cruice's question, LeBlanc stated that he did not have any other weapon in the house.

The walk-through inspection resumed and LeBlanc directed Cruice's attention to his bedroom. Cruice walked through the bedroom and inspected an adjoining storage room. As he turned back to leave the bedroom, Cruice saw in plain view what he immediately recognized as the barrel of a .410 gauge shotgun sticking out from under LeBlanc's bed. Cruice retrieved the gun, opened it, and found it loaded with a shotgun shell. When asked about his earlier denial of having any dangerous weapon on the premises, LeBlanc said he kept the shotgun, which had been his grandfather's, for his own protection and to use on varmints on his property. Cruice then seized the firearm as evidence of LeBlanc's violation of his

4

probation. The home visit lasted for less than ten minutes, while the "walk-through" portion lasted two to three minutes. The district court found that Cruice "did not physically move anything, open drawers, or rifle through personal belongings; rather, he used only his eyes."[1]

LeBlanc moved to suppress the gun, arguing to the district court that it was seized pursuant to an unlawful search. He contended that the probation officer exceeded the scope of the required home visit by asking to look around, and that he did not have reasonable suspicion of a probation violation to support a search of the premises. The district court denied the motion to suppress, holding that the actions of the probation officer did not constitute a search separate from the home visit and that this visit was permissible under the Fourth Amendment given the reduced privacy expectations of probationers.

---

[1] While LeBlanc's statement of facts adheres to his original contention below that Cruice searched his belongings for pornographic videos and that LeBlanc did not lead Cruice through the house, he has not expressly challenged the findings of the district court.

## II. Analysis

LeBlanc argues that Cruice went beyond the permitted "home visit" authorized by Louisiana probation policies. He contends that a home visit is limited to interpersonal contact, and that Cruice's actions violated his expectation of privacy under the Fourth Amendment. In reviewing the denial of a motion to suppress, we review findings of fact for clear error and conclusions of law de novo. United States v. Hicks, 389 F.3d 514, 526 (5th Cir. 2004).

We think the District Court correctly concluded that this home visit and seizure of a dangerous weapon in plain view did not violate the Fourth Amendment. As part of his sentence for the commission of a crime, LeBlanc was subjected to supervision pursuant to the state laws, rules, regulations and conditions governing Louisiana's probation system. The visit and inspection of LeBlanc's home satisfied the demands of the Fourth Amendment because it was carried out pursuant to laws and regulations that themselves satisfy the Fourth Amendment's reasonableness requirement under

6

well-established principles. <u>See</u> <u>Griffin v. Wisconsin</u>, 483 U.S. 868 (1987).[2]

A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches and intrusions upon privacy be "reasonable." <u>Id.</u> at 873. Although it is usually required that a search be undertaken only pursuant to a warrant (and thus supported by probable cause, as the Constitution says warrants must be, <u>see</u>, <u>e.g.</u>, <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980)), the Supreme Court has permitted exceptions when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." <u>New Jersey v. T.L.O.</u>, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring in judgment). The Court has held on this basis that government employers and supervisors may conduct warrantless, work-related searches of employees' desks and offices without probable cause, <u>O'Connor v. Ortega</u>,

---

[2] The Government argues that LeBlanc's consent to the search was effective and justified the seizure of the firearm. Because the district court did not reach this issue or make findings of fact as to LeBlanc's consent, and because our analysis makes it unnecessary to do so, we decline to reach the consent issue as well.

480 U.S. 709 (1987), and that school officials may conduct warrantless searches of some student property, also without probable cause, New Jersey v. T.L.O., 469 U.S. at 341. However, to conduct a nonconsensual search of a probationer's home for ordinary law enforcement purposes under these limited expectations of privacy, it is necessary to show reasonable suspicion that the probationer is engaged in criminal activity. United States v. Knights, 534 U.S. 112, 121 (2001).

"A State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, likewise presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." Griffin, 483 U.S. at 873-874. The Court further explained:

Probation, like incarceration, is a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty. Probation is simply one point (or, more accurately, one set of points) on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service. A number of different options lie between those

8

> extremes, including confinement in a medium- or minimum-security facility, work-release programs, halfway houses, and probation-which can itself be more or less confining depending upon the number and severity of restrictions imposed.

Id. at 874 (citations and quotations omitted). Thus, the Court concluded, "[t]o a greater or lesser degree, it is always true of probationers (as we have said it to be true of parolees) that they do not enjoy 'the absolute liberty to which every citizen is entitled, but only ... conditional liberty properly dependent on observance of special [probation] restrictions.'" Id. (quoting Morrissey v. Brewer, 408 U.S. 471, 480 (1972)).

The Supreme Court has recognized a "continuum" of expectations of privacy under the Fourth Amendment based on the degree of punishment a defendant is subjected to. Samson v. California, 126 S. Ct. 2193, 2198 (2006). "Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." Knights, 534 U.S. at 119.

9

Consequently, reasonable restrictions upon liberty and privacy are allowed and are necessary "to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." Griffin, 483 U.S. at 875 (citing State v. Tarrell, 247 N.W.2d 696, 700 (Wis. 1976)). "These same goals require and justify the exercise of supervision to assure that the restrictions are in fact observed.... Supervision, then, is a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." Id.

Because the permissible degree of a state's impingement on probationers' privacy is not unlimited, we must determine, first, whether Louisiana's rules and regulations for furthering these goals are reasonably necessary and therefore constitutional, and, second, whether Officer Cruice exceeded the authority granted him under these applicable state standards.

Although Griffin differs from the case before us because it analyzed the propriety of a search regulation

permitting warrantless searches of the homes of probationers for ordinary law enforcement purposes, it made clear that intrusions upon the privacy of probationers are reviewed for whether they meet 'special needs' of the state in supervising probationers. "In determining whether the "special needs" of its probation system justify [the] search regulation, we must take that regulation as it has been interpreted by state corrections officials and state courts." Griffin, 483 U.S. at 875. We balance the interests of the government against the probationer's diminished privacy interests to determine whether "special needs" justify the restriction. See, e.g., State v. Guzman, 480 N.W.2d 446, 449 (Wis. 1992).

In determining whether the "special needs" of Louisiana's probation system justify its home visit regulations, we must consider their legislative and administrative sources as well as their interpretation and application by state courts and corrections officials. Griffin, 483 U.S. at 875. Probation conditions authorized by Louisiana law include requiring

11

probationers to report to the probation officer as directed; permitting the probation officer to visit him at his home or elsewhere; requiring him to devote himself to an approved employment or occupation; refraining from possessing firearms or other dangerous weapons; refraining from frequenting unlawful places or consorting with disreputable persons; remaining within the court's jurisdiction; and obtaining the probation officer's permission to change addresses or employment. See LA. CODE CRIM. PROC. ANN. art. 895 (2007).

The supervisory duties required of Louisiana probation officers to enforce conditions of probation, as stated in the Louisiana Probation and Parole Manual submitted as part of Defendant's record excerpts, include: "**Interpersonal Contact** - Face to face contact with the offender which can occur in the field or in the office.... During these contacts, the officer will generally inquire as to the offender's status in all relevant areas such as residence, employment, physical and mental health, marital/family situation, and financial status to determine any changes or problems.

12

... **Residence Verification** - Refers to our determination that an offender (other than a specialized sex offender) resides at a claimed residence which may be established through interpersonal contact at the residence, collateral contacts with other residents or by review of documentation... or telephone contacts with reliable collaterals."

The Louisiana probation conditions and probation officer duties, similar to those authorized and required in the federal system, see, e.g., 18 U.S.C. §§ 3563; 3603, clearly are reasonable and necessary measures designed to promote the rehabilitation of probationers while protecting the community from harm due to their being at large. In reading and applying these standards, the Louisiana courts and corrections administrators have interpreted them in a natural, straightforward manner. Further, in evaluating probation officers' alleged violations of probationers' rights under the Fourth Amendment, the Louisiana Supreme Court has applied a "test of reasonableness" prescribed by the United States Supreme Court which in each case "'requires a balancing

13

of the need for the particular search against the invasion of personal rights that the search entails.... consider[ing] the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it and the place in which it is conducted.'" State v. Malone, 403 So.2d 1234, 1239 (La. 1981)(citing and quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979) and State v. Patrick, 381 So.2d 501, 503 (La. 1980)). Accordingly, we conclude that the Louisiana statutes and regulations under which the probation officer acted in this case fully satisfy the Fourth Amendment requirement of reasonableness.

As a condition of his probation, LeBlanc agreed, and was required by the court, to permit his probation officer "to visit him at his home or elsewhere...." LA. CODE CRIM. PROC. ANN. art. 895(A)(4) (2003). Further, the Louisiana Probation and Parole Officer's Manual authorizes a probation officer to perform a "residence verification" to determine that an offender resides at a claimed residence, and it provides that the verification "may be established through interpersonal contact at the

14

residence...."  "Interpersonal contact" is defined as "[f]ace to face contact with the offender which can occur in the field or in the office." The manual lists a variety of subjects the officer should inquire into during an interpersonal contact, and notes that "[i]nterpersonal contacts should be intensified as necessary to... investigate or verify the offender's compliance with conditions of probation/parole."

LeBlanc argues that Cruice exceeded his authority under the probation condition and the manual. He urges that in order to look around his home, Cruice must have had reasonable suspicion that LeBlanc was engaged in criminal activity, the standard approved of by the Supreme Court in the case of a search of a probationer's residence for law enforcement purposes. Knights, 534 U.S. at 121.  A properly conducted "home visit" for supervisory probation purposes, however, is not equivalent to a law enforcement or criminal investigatory search.

While this Circuit has not yet considered the question, other Circuits in similar cases have held that

15

a probation officer properly conducting an authorized home visit was not bound by the reasonable suspicion standard. The Second Circuit has held that "because home visits 'at any time' are conducted pursuant to a <u>court-imposed condition</u> of federal supervised release of which the supervisee is aware, and because a home visit is far less intrusive than a <u>probation search</u>, probation officers conducting a <u>home visit</u> are not subject to the reasonable suspicion standard applicable to <u>probation searches</u> under <u>Knights</u>." <u>United States v. Reyes</u>, 283 F.3d 446, 462 (2d Cir. 2002) (emphasis in original). The court reasoned that home visits as a condition of probation in the absence of reasonable suspicion were justified because of the need of the state to exercise supervision over probationers, ensuring that they comply with the conditions of probation and do not return to a life of crime. <u>Id.</u> at 461. LeBlanc suggests that a case relying on <u>Reyes</u>, <u>United States v. Massey</u>, No. 03 CR 938, 2004 WL 1243531 (S.D.N.Y. Jan. 21, 2004)(unpublished), implies that a distinction may be made because a search of the defendant's bedroom was not necessary to determine

16

whether LeBlanc lived at the house. In Massey, a parole officer entered a defendant's bedroom as part of a home visit and viewed the room for one to two minutes, noticing a machete handle in plain view protruding from Massey's bed. The defendant lived in a room in his mother's apartment. Applying Reyes, the court reasoned that entry into Massey's bedroom was necessary to confirm that he actually resided in the apartment permanently. We do not read Massey as placing any restrictions on Reyes, or as distracting from the principle of Reyes that a short home visit to determine the suitability of the residence is within the "special needs" of the state in supervising probationers. Reyes is consistent with a long line of cases in the Second Circuit holding that probation officers could enter and view the homes of probationers as part of their supervisory duties. See United States v. Trzaska, 111 F.3d 1019, 1021 (2d Cir. 1997) (noting that a probation officer may properly conduct a warrantless home visit of a probationer for supervisory purposes); see also United States v. Rea, 678 F.2d 382, 387 (2d Cir. 1982)(same); United States v.

17

Newton, 181 F. Supp. 2d 157, 161 (E.D.N.Y. 2002)(holding that "[a] home visit is not a search, even though a visit may result in seizure of contraband in plain view").

The Ninth Circuit has also considered the issue, concluding in an unpublished opinion that the reasonable suspicion standard did not apply because "[s]ince the inception of the probation and parole systems, probationers and parolees have understood that they are subject to home visits from time to time by their probation and parole officers." United States v. Hedrick, 146 Fed. App'x. 871, 872 (9th Cir. 2005) (unpublished). Because the probationer in that case was informed of the home visit condition, and because of the state's need to "determine the conditions and circumstances of the probationer's living arrangements," the probationer's diminished expectation of privacy did not bar home visits conducted without reasonable suspicion of criminal activity. Id.

Several state courts have considered the issue as well. A Maryland court has upheld a home visit that involved a fifteen to twenty minute long tour of a

18

probationer's home. See Volkomer v. State, 897 A.2d 276, 279-80 (Md. Ct. Spec. App. 2006). The probation officer saw in plain view boxes of ketamine, which had been stolen recently from a local animal hospital in a burglary in which the probationer was a suspect. Id. The court held that, crediting the probation officer's testimony as true, the conduct involved in following a probationer around in a tour of the home did not constitute a search. Id. at 287. The Montana Supreme Court has considered the issue generally, noting that home visits are a commonly imposed condition of probation and are important to ensure that probationers are complying with the conditions of probation and that they play a large role in reducing recidivism. State v. Moody, 148 P.3d 662, 666 (Mont. 2006). It adopted the holding of Reyes that a home visit, without more, does not constitute a search. Id. at 666-67.

While the state law we encounter is not identical to those confronted by these courts, we find the reasoning of these cases persuasive. Home visits, as defined as under Louisiana law, as a condition of LeBlanc's

19

probation, and as conducted on these facts, do not constitute as invasive a burden on a probationer's expectations of privacy as does a search. A probationer is subject to state supervision as part of the "special needs" doctrine, including verification of where he lives, and cannot expect to be free from "interpersonal contact" at his residence. Were we to impose a requirement that a probation officer show reasonable suspicion of criminal activity before visiting a probationer at his home, supervision would become effectively impossible.

Accordingly, we must determine whether Cruice, by asking to look around LeBlanc's house, crossed the line from a home visit into a search requiring proof of reasonable suspicion. We conclude that he did not. LeBlanc argues that the Probation Officer's Manual draws a sharp distinction between "residence verifications" and "residence checks." Unlike a residence verification, which involves interpersonal contact at the probationer's residence, a residence check applies only to specialized sex offenders and imposes additional requirements. In a

20

residence check, a probation officer is instructed to "request entry and look around for anything suspicious (toys, dolls, pornography, etc.)." LeBlanc argues that by asking if he could "look around," Cruice conducted a form of search that was not imposed as a condition of LeBlanc's probation. We disagree.

The Louisiana Supreme Court has noted that in supervising a probationer, a probation officer may have to take actions to accomplish a home visit that would intrude upon the liberty of an ordinary person, but not a probationer:

> An individual on probation does not have the same freedom from governmental intrusion into his affairs as does the ordinary citizen. In the case before us, the probation officer was not following a tip that defendant was engaging in criminal activity. [The probation officer] was simply doing his job supervising defendant's probation. It surely is not impermissible for a probation officer to walk into the yard of the person he is supervising.

State v. Malone, 403 So.2d 1234, 1239 (La. 1981). The manual at issue instructs that a probation officer may verify an offender's residence by having "[f]ace to face contact with the offender" at that residence. LeBlanc

21

argues that Cruice went beyond the purposes of a home visit, conducting a "plain view search" of the residence. The district court noted that Cruice testified that "the general purpose of a home visit was to verify compliance with the terms of probation, such as to verify that the probationer lives where he says and that the residence is suitable (not overcrowded and not residing with other felons)."

"A 'search' for purposes of the Fourth Amendment occurs when a reasonable expectation of privacy is infringed." Segura v. United States, 468 U.S. 796, 820 (1984). A probationer is subject to diminished expectations of privacy compared to the general population. Knights, 534 U.S. at 119. Commentary on the Fourth Amendment status of probationers has approved of "[r]outine unscheduled home visits," noting that:

> The unannounced visit, more so than the scheduled visit of the probationer or parolee to the office of his supervisor, may provide useful and relevant information concerning his progress. Moreover, it is relatively unintrusive, and thus is perhaps the easiest technique to justify....

WAYNE R. LaFAVE, 5 SEARCH AND SEIZURE § 10.10(d) at 455 (4th ed. 2004). Others have commented on visits that are factually identical to what occurred in this case:

> In the case of surprise visits, made in the day time, the invasion of privacy is relatively minimal. The term surprise visit should by definition encompass only a situation in which an officer enters the premises, looks around, and perhaps talks to the parolee for a few minutes. Thus defined, a surprise visit is no more significant an intrusion on the citizen's privacy than the brief inspection of the premises which took place in Camara.

Id. (quoting Welch S. White, The Fourth Amendment Rights of Parolees and Probationers, 31 U. PITT. L. REV. 167, 187 (1969)).

Taking the facts as found without clear error by the district court, Cruice did not cross the line from a home visit into a search. He asked to "look around," and spoke casually with LeBlanc as he was led around the house and through the various rooms. As part of the tour, LeBlanc led Cruice to his bedroom, opened the door, and announced that the room was his bedroom, clearly implying his consent to the visual inspection by Cruice that followed. The walk-through lasted no longer than it took literally

23

to walk through the home - roughly two to three minutes. The gun was in plain sight as Cruice walked through the bedroom.

LeBlanc argues that the interpersonal contact could have been conducted in a less intrusive way, by sitting at the kitchen table, and that by entering his bedroom Cruice violated his expectations of privacy. On the facts as found by the district court, Cruice did no more than engage in a brief, roving conversation while being led on a tour by LeBlanc through his house. While the Probation Officer's Manual requires that an officer ask to look around the home of a sex offender, it does not bar it in the case of other offenders and does not define face to face contact. As the Louisiana Supreme Court noted in Malone, a probation officer will necessarily have to perform some actions such as walking through a yard to conduct a home visit. Briefly walking through rooms in LeBlanc's home is no different - Cruice did not closely examine any room, did not rifle through LeBlanc's belongings, and merely followed LeBlanc as he was led

24

around the home. His conduct was incidental to and a part of his interpersonal contact with LeBlanc. LeBlanc, as a probationer with diminished expectations of privacy, cannot expect that a probation officer will not view the various rooms in his home while conducting a home visit to verify that his residence there is genuine and suitable.[3] Cruice thus did not cross the line from a home visit to a search, and on these facts was not required to show reasonable suspicion of criminal activity. We therefore AFFIRM the district court's denial of the motion to suppress the firearm.

---

[3] Among the conditions of LeBlanc's probation, imposed pursuant to LA. CODE CRIM. P. ANN. art. 895(A) (2003), were that LeBlanc:
"[r]efrain from owning or possessing firearms or other dangerous weapons," "[m]ake reasonable reparation or restitution to the aggrieved party," "[r]efrain from frequenting unlawful or disreputable places or consorting with disreputable persons," and "[r]emain within the jurisdiction of the Court and get the permission of the probation officer before making any change in [his] address or [his] employment." The "special need" of the state in enforcing these conditions of probation adds to the reasonableness of Cruice's short walk-through of LeBlanc's residence.